All Mr. Zinnel's convictions depend on the government being able to salvage counts 1 and 2, the convictions of bankruptcy fraud, so I want to go right to the constructive amendment argument. The government caused a constructive amendment of counts 1 and 2, the indictment first, by introducing evidence of other concealments of property that were not alleged in this very detailed, highly specific indictment. And then second, in closing argument and in rebuttal, hammering those items and blending them in with the concealments that were alleged in the indictment, and then saying only one item of concealed property is necessary to convict. And so one of the items that's kind of a case in point that points to the lack of notice is this WAMU account that was discussed so many times in both in closing and then so much that the judge remembered it eight months later at sentencing. If Mr. Zinnel had been on notice that that account, if it had been listed in count 2, he would have introduced a statement to show there was about $235, I submitted the statements to this Court in my excerpts, in that account. But so the Fifth Amendment protects Mr. Zinnel's right to be only convicted on charges that were brought by the grand jury. The jury never saw the indictment. They were not instructed as to what the items were. And so six out of the seven circuits that do have a bankruptcy fraud model instruction, which this circuit does not, require listing them. Isn't the law that we're not supposed to give a copy of the indictment to the jury? Well, the jury was told in jury instructions the above were the alleged charges. And so there are times where the indictment is sometimes given to the jury. But in this case, I'm just pointing out that it wasn't, that there was no way that the jurors would ever know which, what was the universe of concealments of assets that they were allowed to consider. And the prosecutor argued and hammered at, in closing, that they could consider assets that were specifically not mentioned in the indictment. Well, the indictment referred to among others several times, I think, did it not? Yes. Thank you for that question, Your Honor. That's one of my big points here. So the government argues that, so among others appears in count one in the preamble where it talks about ways and means. And the only case I could find on this kind of a novel idea was a Second Circuit case from 1988, the Zingaro case, that said that that type of language was not sufficient to cover other types of extortionate loans in that case. The indictment also referred specifically to some of the assets that you're concerned with, like the, what was it, the Dunn deal or a couple of others. Can I first finish with the among others, because among others appears in count two also, but that appears with regard to false statements. And so false statements is not an element of bankruptcy fraud. So just mentioning the names of companies, and that goes to Your Honor's point, mentioning the names of various assets in and among other aspects of the indictment, but not in the list where it says he concealed these items. Those were listed, especially count two is highly specific. It says the following property, 1, 2, 3, or whatever. It's in alphabetical, I think. And the other one, it says in paragraph five for count one that the items that were mentioned in 4A through N. So the government also says that because it would have been allowed to use a general indictment, that it's okay and shouldn't be held to the specific properties that were alleged in this indictment. But the Supreme Court and this Court, in many cases following the Sterone case, has rejected that argument and specifically says even though a general indictment would have been okay, it wasn't, for example, in Sterone. It wasn't, he was charged with interfering with the shipments of sand. But at trial, they also introduced evidence of shipments of steel that were interfered with. That was a separate set of facts, a separate mental state or, you know, incidence of making a decision to do that. And so it was because the jury was told that they could find the defendant guilty of either sand or steel, that because the indictment was specific as to sand, that they couldn't uphold those convictions. And so they had to be reversed. Do you have any other questions on that particular point? Okay. All right. I'm going to move on to the jury instructions. So this Court can reverse the bankruptcy fraud counts and then all the other counts have to fall also on the separate ground of the deficient jury instructions. So the jury instructions, as I said, didn't specify the items that were included in the indictment, the universe of properties. And then they also very confusingly said the alleged items as to one and the above items of property as to count two. There were no alleged items. There were no above items except what was provided in closing argument by the government. And so the government has a very high standard for jury instructions. It's no reasonable possibility that the error materially affected the verdict. And they can't show that here. Now I want to just briefly go to the sentence. In particular, the number of victims, the Court was not allowed to estimate victims, estimate the number of victims like they sometimes do for the loss amount. And the Court was not allowed to just accept blindly the PSR, which pulled a list of claimants from the reopened bankruptcy. So not the people that were all listed originally, but the reopened bankruptcy, those dollar amounts, those victims, they were listed. And the Court had to find individual victims that were, had actual loss that was actually counted and countable correctly under 2B1.1. And so I list them all in my AOB on pages 53 through 55. But the low-hanging fruit are Stuart Allen, which by its own documents, it didn't pay the 3,000 or so dollars. It never had to pay out any money, so it was not a victim. It was something that had been paid by travelers, and we showed that. First Bank, the prosecutor, agreed in sentencing that secured claims cannot be losses because they got the property that was the security. So First Bank can't be a victim. And then the two additional companies that were subsidiaries of Safeco, my client signed one indemnity agreement. And so that one agreement, he was, you know, he signed with one company, and the fact that they had a parent company and two subsidiaries and they all submitted claims doesn't divide the claim up and make it that they were multiple victims. So I'd like to pass this up. Roberts. Good afternoon, Your Honors. May it please the Court. Becky James on behalf of Appellant Darian Edson. I'd also like to reserve two minutes for rebuttal. I'll focus my comments primarily on the sufficiency of the evidence. Unlike Mr. Zennel, Ms. Edson was convicted only of two money laundering counts. She was acquitted or not convicted by hung jury on all of the bankruptcy fraud-related counts. So as to the two money laundering charges, those charges and her convictions were flawed on multiple levels. First of all, the convictions were based on these two negotiations that she engaged in with her, who she thought was opposing counsel essentially, Frank Radslevich. And but what it turned out to be was this was actually a sting. There was no actual negotiation going on here. It was wired. This was a government setup. And so the first prong. Sotomayor. What do you mean by a sting? The government set this transaction up. So the government was in. But the person had offered to buy out Mr. Zennel prior to the government's involvement, correct? Well, it's actually unclear when he when he became an informant for the government. The record is unclear. But even in. Clearly there's a cooperator. I'm just wondering why you're calling it a sting. Well, right. Because by the time Ms. Edson was involved in it, clearly the other two participants, Mr. Radslevich and Mr. Wilbert, who wasn't present but who was involved, were working for the government. And as I said, the evidence is the record is somewhat unclear when Mr. Wilbert became an informant, whether it was before or after the $4 million number was thrown out there. But by the time she was in there negotiating, this was the government trying, just working through its informant to try to get her to essentially incriminate herself on a money laundering charge. So the, this, but it was charged as a 1956A1 charge, which requires that there in fact be proceeds of, that are to be laundered. And that's what's missing. One of the things that's missing here is there were no funds in, there were no proceeds, in fact. The proceeds at this point were just the, the subject of government, of the government's setup. So there were no. Sotomayor, got to have $6 million in the bank. Had $6 million in the bank, but that doesn't mean that there were going to be, that these were going to be proceeds that were ever going to see Mr. Zennel's hands. In fact, we know that they would not. So there would never have been, there were not, nor will there ever have been any proceeds, any portion of that, any of that $4 million or any portion of that $6 million flowing to Mr. Zennel. So there were no actual proceeds involved here. So that's one of the issues. We've also discussed in the briefing that there was not any financial transaction specifically at issue. The government did not put any evidence in that there would have been actually a financial transaction involving, in fact, proceeds. While the government can charge a sting under 1956A3, that was not the charge that was presented here. There was no instruction on the elements, which are somewhat different under 1956A3. I don't understand your argument yet as to why there are no proceeds. Well, because there was no, because nothing had flowed, nor could it ever flow out of that to Mr. Zennel at that point. By this time, the government, you know, was involved in this. There was not going to be, those $4 million that they're talking about was a fiction. I mean, there's not, that wasn't going to happen. That's what she intended to accomplish. What she intended to accomplish? Well, I mean, she. Seems pretty clear. This is attempt, right? This is not accomplished? There was attempt and conspiracy. But there does have to be. So it's not necessary that there actually have been a flow of money? No, not that the transaction had been completed, but that there were real proceeds at issue. And I guess that's what I'm saying. There were some real proceeds of bankruptcy fraud. I mean, with that, let me move on to the next point, which is there also has to have been proceeds that she knew were the proceeds of the specified unlawful activity, in this case bankruptcy fraud. And that is another place where the evidence is insufficient, because there's just no evidence that she knew, that she knew that these proceeds were the, were the proceeds of bankruptcy fraud. Bankruptcy fraud. Weren't these, I thought these proceeds were the basis of his interest in, which one was that, the number, the name of the company? System 3. System 3. He had, he had a, he had a stake in it, a sort of an undisclosed stake, right? Well, I mean, that's, that's the stake. That's what they valued it at. And that was not disclosed in the bankruptcy proceeding. Well, it was a disputed issue, was what was the nature of that interest, right? So there had been, these parties, long before Miss Edson. They seemed to agree it was at least, at that time, it was at least worth $4 million. Well, the, no, I would not say there was an agreement that it was worth $4 million. That number was out there. It was quite a bit, because the brother who had a smaller estate got a million and a half. Perhaps, but it, but it was. What do you mean perhaps? He didn't get a million? No, he did. He did. But was it perhaps worth $4 million? But that was never, that was never adjudicated. I mean, in fact, the number that ultimately that ownership interest was valued at in the bankruptcy was actually $350,000, which is one of the issues we talk about with respect to the sentence. But getting back to the sufficiency issue, the, the, in the negotiations, what becomes clear is Miss Edson was not focused on, she had not been involved in the bankruptcy. This is consistent with the fact she was not convicted of any of the bankruptcy fraud charges. She was not involved. She, in fact, said she didn't know what he had put on his bankruptcy schedules. So while she was familiar with the structure, the way the parties had structured their transaction, which, or their agreement, which was to do, make distributions through this consulting agreement and not characterize it as an ownership interest, she was, she was not aware of the fact that that was concealed in the bankruptcy or that it necessarily would be. In fact, in the discussions, they talked about, you know, that Zinnel could effectively remedy, if there had not been a disclosure, he could change that by amending the bankruptcy schedules. So even if there had been a nondisclosure, which was basically brought to our attention by Radsovich working for the government during these sessions, that, that wasn't her, her intention. She had no objection to the idea of him amending his bankruptcy schedule. In fact, she said it was a good idea. So that was not her intent in this transaction. Her intent was simply to try to get the, you know, get the parties to reach a resolution in terms of one payment, a payment from Zinnel to Edson. It did not have anything to do with concealing anything from the Bankruptcy Court. And the final prong is the knowledge of the purpose of this transaction was to conceal the bankruptcy fraud closely connected, but still a separate element, that this was the, that was the purpose of this transaction. So even if you could establish, well, there was, she had some knowledge, probably if, if anything, obtained only at this time, that there might have been a failure to disclose assets, that concealment is the bankruptcy fraud of which she was acquitted and not ultimately convicted. This transaction, there was no intention on, of this interaction, of this transaction, that is, this buyout or the termination of the business relationship, to conceal anything. It was anything that, it was to, in fact, her intention in this, as she made clear, was to keep the same relationship. So in other words, this is how they've set up their structure. I think we should just, you know, we should keep it the same. This is the way the distributions have been made. It's gone through this consulting agreement. Whatever that, if that had been a problem in the past, that's not at issue here, as she explained to Mr. Radsford. What we're trying to do here is just make these parties square. So that, she certainly did not know or intend that the transaction she was negotiating was intended to, to conceal any other concealment that had happened before. So the bankruptcy fraud had its own concealment element. She was not convicted of that. There was no evidence that this transaction was designed to conceal that crime. I would just refer the Court to the Falkenberry case in the Sixth Circuit, which I think is helpful in that point. And I will reserve it. Roberts, so two minutes apiece saved. Thank you. Good afternoon, Your Honors. Matthew Siegel for the United States. With Audrey Hemeseth, I tried the case and did the sentencing. What I intend to do is argue any trial issues. And depending on kind of where things go, Ms. Hemeseth will then take over to, to argue whatever sentencing. We'll start with 1010. No, let me understand. She's going to argue or not argue? She's going to argue the sentencing. Oh, she is going to argue? Yes, yes, yes. You said depending on how things go, which made me not sure as to what your intent was. No, I meant we'll divide our time depending on how things go, Your Honor. I apologize for the lack of clarity. Do you have a sort of an estimate as to how you want to divide it? About halfway. Okay. All right. What I'd like to do on the trial issues is start with the, is just go in the order that the defense just argued. Basically, start with variance. And what, what defendant Zinnel is now saying is that the crime was substantially altered at trial, such that it's impossible to know whether the jury convicted of the same crime. And they say that we, we hammered these uncharged properties. But that's just not consistent with my recollection of the trial, and with the closing arguments that start at the excerpts of Record 1043. My partner began with the Starbucks meeting between Zinnel and Wilbert, and where Zinnel said, I need some money, I know this is between, it looks like it's between Done Deal and, and System 3, but this is really you and me. Then we said, played a recording of Darian Edson, which is at ER 1464, saying that Darian wanted the same thing. This was a System 3 trial, a System 3, and System 3 closings. Defendant Zinnel's closing was, everything depends on Wilbert, and you have to acquit. And defendant Edson's closing was essentially, she never knew Wilbert, she never had state of mind, you got to acquit her. So then what happens in rebuttal, and if this were a real variance, you would think that the government stood up and said, aha, look, we've got this personal checking account. That is not what happened at all. Actually, what we did was we held up the System 3 distribution list, but Zinnel and Wilbert kept this spreadsheet that had on its columns the false invoice, whether it was Tom Wilbert or David Zinnel or Stephen Zinnel receiving money, and, you know, calling it distributions. And I held it up and I said, this and the bankruptcy schedules alone convict Zinnel. And then there was the e-mail that he sent to Julia Wilbert where he said, I need a done deal distribution, you know, here's the fake invoice, and said, you cannot write that e-mail and walk out of this court not guilty. So the complaint seems to be this WAMU personal checking account, which I guess is not the done deal WAMU account, but a different WAMU account that had a couple of hundred dollars in it. Right. Is that emphasized in any way? No. And I think that's the source of the confusion is that both of those accounts were at WAMU, and we spent just a ton of time with witness Kimberly Barr showing that the done deal account was Zinnel's personal checking account. That was his personal account. And if you look at excerpts of record 1116 through 17, I'm holding up the bankruptcy schedule and saying personal account, where's done deal, where's done deal, look at all the money he spent out of it. This was his personal account. It's not referring to this nothing. You need to look at the exhibits that are actually being referred to during that closing. All right. So Edson's sufficiency now if the court has no questions about variance or constructive amendment. Oh, and the among others case from this court is Doss. So the next thing for Edson on sufficiency, this was not a sting. Frank Radoslovich testified at ER 839 that the government gave Radoslovich no coaching about what to say, and he didn't care if anybody got prosecuted off of this thing. According to Radoslovich on the next page of transcript, ER 840, this was a real discussion that could have led to a lawful way out by reopening the bankruptcy. And Radoslovich, in his accompanying testimony, says that he didn't think that the FBI was pleased that he gave Edson kind of a way of getting paid without getting indicted, essentially. She comes back, and indeed, Edson does say, well, I think that's a good idea. That's at the February meeting. Then she comes back at the March meeting and Radoslovich says, well, what about going back to the bankruptcy? Edson says, I talked to Steve, so I've done that, and we're not going to do that, and this is a quote, it would open a whole can of worms. Does the record reflect when Radoslovich and Wilbert became cooperating witnesses with the feds? I don't think so. I'm not sure. We know it had to have been before Wilbert met. Right, so it was before the Starbucks meeting, for sure, but it was after David Zinnel did his agreement with System 3 and got paid the very next day. Right, so that exhibit where David Zinnel is getting cashed out of his interest, that was something that we were not around for. Right, but the point at which Wilbert says, I'd like to buy you out, how about $4 million, was he a cooperator at that point? They met. He proposed a buyout agreement. Yeah. Wilbert was trying to get the Zinnels out before he met the government, but when the reason I'm hesitating to answer your question is I don't know when they arrived at exactly the $4 million number. When the document was written that said, we propose to buy you out for $4 million? If that's important to the Court, I can – I've heard people get the opportunity to send something. I really don't know if it's in trial evidence, and I don't want to make it up. Well, I was just curious, because counsel had argued that they were cooperators all the way through. Well, I mean, it depends what you mean by cooperator. He was told he wasn't a target. He was asked to wear a wire. He did that. But Radoslavich. Very cooperative. Indeed. Indeed. But Radoslavich does something that he thought that the government would not want. He gives them a way out. Right? To hear Radoslavich's testimony, he says, look, why do you guys want to do a money laundering transaction? Why don't we just go back to the bankruptcy court? And the response from the defendants is no thanks. So in that conversation, the government was present monitoring, but having no more direction than we would have if it had been a T3 or something. It just wasn't – there was no script for that. We were the cameraman, but not the script writer or the director. Now, as Your Honor said, System 3 had the money. David Zinnel got paid the next day. Really, like, if that agreement had been inked, they could have been paid the next day. That's at 1423 to 4. And then the question is, well, is it proceeds? Under this court's case, Latham, that's the case where somebody concealed stores and real estate from bankruptcy estate. It wasn't just the income stream from the stores. It was the stores themselves that were proceeds. You can have proceeds that isn't cash. Right? So at this point, whatever Zinnel was able to keep from his creditors is proceeds, and he's trying to get paid. For Darian Edson's knowledge, I think the brief is pretty clear on that. She denies knowing about the bankruptcy, and then, according to Rudoslovich, kind of acts surprised when he confronts her with the fact that she was a creditor. That's at – supplemental excerpts at 530. She describes the distribution system that they had between Dundeal and System 3. And, you know, her response about Rudoslovich's concerns about the nondisclosure to the bankruptcy is, well, that's Steve's problem, not yours. And the kind of most important evidence of her intent to conceal is the writing itself that they wanted to execute. Right? I mean, that agreement doesn't say that it's for cashing out an ownership interest. That is disguising and concealing. Finally, for an interstate – for the interstate nexus, you know, Dundeal's got money in the bank. I'm sorry. System 3 has money in the bank. There's no other plausible way that anybody has proposed that a $4 million transaction would have been effected except to use some facility of interstate commerce. The one that we proved at trial was, look, their history has been that they're writing checks to each other. You can fairly infer under Neville's that they would have written a check. And then the other thing is even Neville's had this alternative theory that, you know, I was asleep with the gun. But Edson's theory is what? You know, they can't come up with an alternative theory because, I mean, just in common sense you can't effect a $4 million transaction without somehow implicating, you know, some facility of interstate commerce in some way. Like, you know, were they going to put it in the back of a car? Okay, fine. You know, guilty. All right. So with that, Your Honor, I will ask my colleague to argue the sentencing. Thank you. Let's hear from your co-counsel. Thank you, Your Honors. Unless there are additional questions about the sentencing arguments raised in the briefs, I'll just respond to the two issues that came up in argument today. The first one is the number of victims. The court here did not make an estimate of the number of victims. It made a specific finding that there were 11 victims. That came from the PSR, and the PSR got it from the bankruptcy claims register and from Zinnle's own admissions and his bankruptcy schedules. In 2011, the bankruptcy here had been reopened. That's coincident with the indictment in this case. So the 2011 claims register is what the PSR drew that number from. And Zinnle didn't actually object to that paragraph of the PSR that talks about that reopened bankruptcy claims register. The bankruptcy itself didn't actually close until 2017. So at the time of sentencing in this case, 2014, the court had to look at available evidence, which was what was happening in the bankruptcy at that time. And that's where the 11 victims number came from. The government did not concede its sentencing. The earlier bankruptcy report that Zinnle had filed was at least 11, was it not? Correct. Right. At least 11 in the claims register and, more importantly, in Zinnle's own admission on his bankruptcy schedules, trying to say, I'm broke. This is a real debt that I have. Look here, all these people to whom I owe money. And secured creditors were in that list. What was discussed at sentencing was that the court has a case, Nazifpur, which is under the old fraud guidelines that say actually that secured creditors can be victims in a bankruptcy fraud case. The government didn't concede that the secured creditors in this case aren't victims. They are. They're on that list of 11. And it wasn't clear at the time, 2014, when sentencing occurred, whether any of those there wasn't evidence that they had been. So the fact that they're in the bankruptcy making a claim and also in Zinnle's own schedules, that's plenty of evidence to support the district court's specific finding of 11 victims. I do have questions, and maybe you'll get to it later, though, about disparity and whether considering the guidelines is automatically checking the box of no disparity because the guidelines consider disparity. And if Treadwell says that, is Treadwell good law? Or if disparity isn't the right grounds, then substantive unreasonableness. I mean, these were long sentences. And when we're looking at Enron and other kinds of cases, these are long sentences. So my answer is yes to every question that you just asked. Yes, Treadwell says what you just said. Yes, Treadwell is good law. No, there's not a circuit split about Treadwell. The one case that is cited in the reply briefs out of the Third Circuit is about an out-of-guidelines sentence and a variance downward without much explanation. And the Third Circuit there found that that was problematic. This is an in-guidelines sentence, and that's exactly what Treadwell is about. And for good reason. It's the Supreme Court's Rita case that says that the sentencing commission does this wholesale and the district courts do it retail. And to have the district court try to recreate what the sentencing commission does in figuring out the guidelines, it's not possible. It's an impossible task to go through the different cases where the district court doesn't have the PSR in those cases and doesn't have the available facts in those cases, versus in this trial, the district court, of course, sat through the trial, read the sentencing memos, read the PSR, and correctly calculated the guidelines. The Court is entitled to rely on that alone to find that there is no disparity. Then the substantive reasonableness. Right. And the allocution issue is of concern. Okay. I'll quickly do substantive reasonableness. You are even cautioned at the time. You tried to save the judge. There should be some allocation. Or that allocution should be conducted. Let him run on. Well, I don't want to miss the substantive reasonableness, so let me get to that. Because the district court did both steps here. The district court did correctly calculate the guidelines. And then the Court went through the 3553 factors fairly thoroughly, and it focused on the factors of deterrence and protecting the public, and cited all the facts that the Court remembered from the trial, facts that the Court had learned subsequent to the trial. None of which shed either defendant in a good light, and found that this was an appropriate sentence, 17 years for Zinnel and 10 years for Edson, and cited the reasons for those. The Court did note that it had considered factors in favor of both defendants, the letters sent in, and it cited specific factors from each letter, but then focused on the elaborateness of this crime, the fact that it used not just one court system, but two court systems to perpetrate these lies for purely selfish purposes, that this wasn't a crime of desperation, that these were both defendants who were capable and with means, and yet elected to pursue this selfish court. Every conclusion that the district judge reached in finding this sentence is part of what the district judge was required to do under 3553. It learned those facts from this case, from this record, and then appropriately undertook the statutory obligation it had under 3553. On the elocution, so this was not a short or chilled elocution. This was a lengthy elocution. And at the limited. No, Your Honor. Actually, no. There's an interruption. I will concede that several interruptions. More than one. More than one. But with a purpose. So in the first interruption, Judge Nonley signals this is growing long and I'm going to put a three-minute limit on it. But then he doesn't put a three-minute limit on it. At the second interruption, he cautions Zinnel again and explains to him what mitigation is and says I need you to focus on this. And I will permit you to continue if you focus on that. I'm paraphrasing. But that's the purpose of that interruption. And then at the third warning, and I think where I would like to direct the Court's attention in the record is at ER 1248. So Mr. Zinnel has already been warned three times to focus in on mitigation. And instead he's talking about loss amount. And Zinnel in his elocution actually, by the way, says loss amount should be 1.6 million, not zero. So there's always some loss amount that's at stake here. But then the record reflects that defense counsel confers with Zinnel. And the inference that the Court can make is let's focus on mitigation here. Let's keep it topical. And then finally Zinnel says and I'm ashamed and my kids, basically. And then the elocution concludes not with Judge Nunley cutting him off but with that is the natural wrap-up of the elocution. And then Judge Nunley acknowledges that yes, at the end, you made points that were mitigating. But the majority of the elocution was very self-serving, cast blame at other people, attempted to diminish the crime. And then Judge Nunley appropriately mentioned that elocution as being something that he considered in his 3553 analysis as being a factor against Mr. Zinnel. Thank you very much. Thank you. Thank you. And you've saved two minutes each. I think I actually had two minutes and 40 seconds left last time. You know, that is true. All right. Your court counsel used it up, but I'm going to give it back to you. Thank you. All right. So first I want to address the first argument that Mr. Siegel made. So it doesn't matter that the government spent most of his time introducing evidence about System 3. Yes, most of the trial was about System 3. But in closing argument, the prosecutor argued, I believe it was Ms. Hemmeth argued first, that corporate control, that a beneficial interest in Dundee, that was the first time anyone heard that phrase. They also mentioned First Bank during the trial, but they didn't argue that Mr. Zinnel could be responsible for not revealing First Bank, the whole company. And then so they argued two different properties that were not alleged as to count one. And then as to count two, they said. I'm sorry. Which, what two? So corporate control and a beneficial interest in Dundee. So and then they also talked about the whole company of Dundee. But so there was really no confusion between the two bank accounts. Over and over they called it Steve's personal bank account or Steve's personal WAMU account. And then they called it the Dundee account. And that's throughout the transcripts the court can see that. So at 1053, excerpts of record 1054, and then at 1116, again, references to Steve Zinnel's personal bank account as not being disclosed. So those were told to the jury that they ought to rely on them. As to the number of victims, the Court ignored all the available evidence that we provided. So the Court just focused on the PSR. The case law is clear that when we present, the defense presents evidence, the Court has to evaluate it and consider it. And this judge gave a sentence before he heard from me in argument and before he heard from Mr. Zinnel in allocution. He said the sentence he was going to impose, and that's the same exact sentence that he did impose. That troubled me a little bit. He said more or less, you know, tentative, here's what I'm thinking about. I mean, but no judge goes on the bench without some notion of what the sentence is going to be. His mistake, if mistake it is, is to say it out loud. Well, so I don't think he was as wiffly waffly as the Court is describing. I think he was pretty clear. He used a very strong tone of voice. And he sentenced my client to 24 months higher than the PSR, which already recommended this, as Your Honor noted, a very high sentence and very high sentencing guidelines. And those sentencing guidelines, the loss, the fraud loss table, is not a product of the Sentencing Commission's normal function, looking at data and considering cases. It was a political change. I just described it at length, the process of bringing down the number of dollars that is needed to get this massive high increase. And you've now used 3 minutes. Thank you, Your Honor. Ms. James. Thank you, Your Honor. Just a couple of very brief points. On the government's argument this was not a sting based on Mr. Razovich's comments, well, he wasn't instructed, this was real in his mind. His state of mind isn't what matters. I mean, what matters is that the government was there. They orchestrated it. They were this transaction would not have reached fruition. There never would have been these proceeds given to Mr. Zenil because the government was already investigating. That would not have transpired. And that's our point. As to the March meeting referenced by the government where they re-raised the issue of could Mr. Zenil amend the bankruptcy schedules, this is at ER 1507. Ms. Edson refers to that, and she does say she shared that information and with and left it at that is what she said. No, I shared that information and left it at that. When pressed, she's not going to do that right. She says, well, it may open a big can of worms. But it's unclear at that point, and certainly her mind and her intention, whatever Mr. Zenil's intention might be, her intent was not to further a concealment. Her intention was to resolve this matter in the way that made sense for these parties. So and then just very, very briefly, we've really, I did not discuss sentencing in my openings, but to respond very quickly to the government's comments. And the Court, to some extent, I would ask the Court to look at these sentences, look at, and in particular Ms. Edson's sentence, carefully. And on the one issue I touched on briefly, on the calculation of the value of the funds laundered, there was no finding. This $4 million number is out there, but there was no finding that that was actually the value of the funds laundered. The only finding that is in the record is the $350,000 finding. And that, of course, would make a tremendous difference. Okay. There's your two minutes. Thank you, Your Honor. Thank you. Thank both sides for their arguments. United States v. Zenil and Edson submitted for decision, and we are now in adjournment. Thank you. All rise.
judges: W. Fletcher, Paez, Wilken